# FOR PUBLICATION



FILED & ENTERED

JAN 20 2023

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY sumlin    DEPUTY CLERK

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>The Hacienda Company, LLC,<br><br>    Debtor. | Case No.:    2:22-bk-15163-NB<br><br>Chapter:    11<br><br>**OPINION ON MOTION TO DISMISS CANNABIS-RELATED CASE**<br><br>Hearing Date:<br>Date:  December 20, 2022<br>Time:  1:00 p.m.<br>Place: Courtroom 1545<br>           255 E. Temple Street<br>           Los Angeles, CA 90012<br>(and via Zoomgov per posted procedures) |

This Bankruptcy Court has already issued an order (docket no. 71) denying the motion of the United States Trustee's ("UST") to dismiss this case (docket no. 53, the "MTD").  This Opinion memorializes and further explains this Court's reasoning.[1]

**1. BACKGROUND**

The above-captioned Debtor was in the business of wholesale manufacturing and packaging cannabis products under the "Lowell Herb Co." brand, a/k/a "Lowell Farms," and it ceased operations on February 25, 2021.  At one time, Debtor owned

---

[1] Unless the context suggests otherwise, a "chapter" or "section" ("§") refers to the United States Bankruptcy Code, 11 U.S.C. § 101 et seq. (the "Code"), a "Rule" means the Federal Rules of Bankruptcy Procedure or other federal or local rule, and other terms have the meanings provided in the Code, Rules, and the parties' filed papers.

land that was intended for use as a cannabis cultivation center, but Debtor did not achieve this goal and the vacant land was sold in 2020 to pay creditors.

After Debtor ceased operations, it transferred its value to a publicly traded Canadian company – allegedly by structuring the sale as one of intellectual property, not the sale of an operating cannabis business. The acquirer's sole business is cannabis growth and sales, which apparently are legal under Canadian law. In return, Debtor received a roughly 9.4% share of the equity shares of the acquiring entity. The acquiring entity changed its name to Lowell Farms, Inc.

On September 21, 2022, Debtor filed this bankruptcy case. In Debtor's initial status report, Debtor stated that it intended "to propose a plan of reorganization that provides for Debtor to sell off the shares of [Lowell Farms, Inc. that] it owns in an orderly fashion and use the proceeds from the stock to pay creditors [or] … Debtor may elect to distribute the shares it owns to its creditors directly." At oral argument, Debtor's counsel elaborated that the stock of Lowell Farms, Inc. is thinly traded and therefore, to avoid flooding the market and depressing the return to creditors, "we're talking about selling it off in chunks [over time] …." Tr. 12/20/23 (docket no. 76), p. 16:19.

## 2. JURISDICTION, AUTHORITY AND VENUE

This Bankruptcy Court has jurisdiction to decide the MTD, and venue is proper, under 28 U.S.C. §§ 1334 and 1408. This is a "core" proceeding in which this Bankruptcy Court has the authority to enter a final judgment or order under 28 U.S.C. § 157(b)(2)(A) and (O). See also Stern v. Marshall, 131 S. Ct. 2594 (2011).[2]

---

[2] Although the UST has filed a notice of appeal, that does not divest this Bankruptcy Court of jurisdiction to issue this Opinion for two alternative reasons. First, so far as this Bankruptcy Court is aware, no appellate court has granted the UST's motion for leave to appeal (docket no. 90). See In re Rains, 428 F.3d 893, 903-904 (9th Cir. 2005) ("if the order at issue is interlocutory, any appeal … would not transfer jurisdiction to an appellate court") (citations omitted); In re Bertain, 215 B.R. 438 (9th Cir. BAP 1997) ("The denial of a motion to dismiss is an interlocutory order") (cleaned up; citations omitted). Second, this Opinion does not alter or expand any prior rulings, and instead merely provides further explanation, as anticipated on the record at the above-captioned hearing. See Rains, 428 F.3d at 904 (other exceptions to rule that notice of appeal divests lower court of jurisdiction).

## 3. DISCUSSION

### a. Legal standards

As the parties acknowledge, the burden of establishing "cause" for dismissal under § 1112(b) rests with the party seeking dismissal. *See In re Rosenblum*, 608 B.R. 529, 536 (Bankr. D. Nev. 2019). The movant must show such cause by "a preponderance of the evidence." *In re Woodbrook Assocs.*, 19 F.3d 312, 317 (7th Cir. 1994).

If the movant establishes that "cause" exists under § 1112(b)(1), then the opponent can still prevent conversion or dismissal under § 1112(b)(2) if (1) the court "finds and specifically identifies unusual circumstances establishing" that conversion or dismissal is "not in the best interests of creditors"; (2) the opponent shows that "there is a reasonable likelihood" of confirming a plan in a reasonable amount of time; (3) the opponent establishes that the grounds for conversion or dismissal include an act or omission of the debtor for which there is a "reasonable justification"; and (4) the opponent establishes that the act or omission can be "cured within a reasonable time." *See Rosenblum*, 608 B.R. at 536-37 (summarizing § 1112(b)(2)).

If the debtor cannot satisfy the "unusual circumstances" elements under § 1112(b)(2), then the bankruptcy court must choose "between conversion or dismissal based on the best interests of the creditors and the estate." *In re Nelson*, 343 B.R. 671, 675 (9th Cir. BAP 2006) (citation and internal quotation marks omitted).

### b. Violations of nonbankruptcy law, generally

A violation of nonbankruptcy law is not expressly listed as "cause" for dismissal under § 1112(b)(1) & (4), but compliance with applicable nonbankruptcy law generally is required both by statute (*e.g.,* 28 U.S.C. § 959) and under the authorities cited by both parties, so it appears to be undisputed that violations of nonbankruptcy law *can* be cause for dismissal. That said, there are many remedies for any debtor's violations of any law, rule, or procedure, and dismissal is one of the more extreme remedies.

There are several alternative reasons why violations of nonbankruptcy law might establish cause for dismissal. First, such violations might establish a lack of "good faith" sufficient to warrant dismissal. *See, e.g., In re Arenas*, 535 B.R. 845 (10th Cir. BAP 2015) (debtors' marijuana business, while legal under state law, was illegal under federal law, and thus the debtors could not propose a confirmable plan in good faith). *See generally In re Leavitt,* 171 F.3d 1219, 1224 (9th Cir. 1999) ("cause" for dismissal not defined by the Code, but can include "bad faith"/lack of "good faith"); *Rosenblum,* 608 B.R. at 537 (listing common considerations in assessing good faith).

Second, violations of nonbankruptcy law might constitute "gross mismanagement" of the estate, within the meaning of § 1112(b)(4)(B), because violations of nonbankruptcy law might expose the estate to financial losses and criminal sanctions, and violating the law might constitute "mismanagement" *per se*. *See, e.g., In re Rent-Rite Super Kegs West Ltd.,* 484 B.R. 799, 809 (Bankr. D. Colo. 2012) (Debtor's decision to continue leasing warehouse space to tenants engaged in the business of growing marijuana exposed Debtor to criminal liability and the risk of forfeiture which amounted to gross mismanagement).

In addition, violations of nonbankruptcy law might warrant dismissal under general principles applicable to a bankruptcy court as a court of equity, pursuant to bankruptcy judges' oath of office to uphold the law, or on other theories. *See, e.g., In* re *Johnson*, 532 B.R 53, 56-58 (Bankr. W.D. Mich. 2015) (suggesting that authorizing debtor to continue generating income from marijuana operations appears inconsistent with judicial oath to uphold the law, but concluding that Debtor could remain in bankruptcy and avoid dismissal of his case if he ceased marijuana operations). *See also* MTD (docket no. 53) pp. 8:18-17:11; Opp. (docket no. 59) pp. 3:6-19:26; *and* Reply (docket no. 63) pp. 7:22-11:14 (discussing authorities).

But the authorities cited by the parties also appear to reflect some degree of discretion. Ongoing postpetition violations are far more problematic than prepetition violations; and although indirect connections with illegal activity might violate

nonbankruptcy law, the degree of connection appears to be important to deciding whether to dismiss the case. *See e.g., In re Burton*, 610 B.R. 633, 637-638 (affirming dismissal as within bankruptcy court's discretion, but holding that "the mere presence of marijuana near a bankruptcy case does not automatically prohibit a debtor from bankruptcy relief," so a "bankruptcy court must be explicit in articulating its legal and factual bases for dismissal in cases involving marijuana") (citations omitted); *and see also Garvin v. Cook Investments NW, SPNWY, LLC,* 922 F.3d 1031, 1036 (9th Cir. 2019) (bankruptcy judge is not an "ombudsman without portfolio, gratuitously seeking out 'illegalities' …, a result that would be "inimical to the basic function of bankruptcy judges …") (footnote, citations, and internal quotation marks omitted).

### c. The Controlled Substances Act, 21 U.S.C. § 801 et seq. (the "CSA")

The UST has not established any ongoing violation of the CSA by Debtor, as distinguished from any prepetition violations, either (i) by any connection to distributing cannabis or (ii) by stock ownership in a cannabis-related enterprise. Nor has the UST established that, if a chapter 11 trustee were appointed or if this case were to be converted to a chapter 7 liquidation, any trustee would have to engage in a violation of the CSA.

#### i. No ongoing distribution of cannabis

True, the CSA covers conspiracies with intent to distribute cannabis, and one way to characterize the facts might be that Debtor is effectively conspiring to continue carrying on its California-based cannabis business indirectly, through its ownership interest in a Canadian company operating under Debtor's former name. *See* 21 U.S.C. §§ 846 (conspiracy) *and* 856(a) (illegal to "control any place" or "profit from" a place used to manufacture, store, distribute, or use cannabis), *and* MTD p. 8:1-8. Alternatively, even if (as this Bankruptcy Court finds and concludes) Debtor is *not* effectively carrying on its prepetition cannabis business indirectly, Debtor did structure its own liquidation in a manner designed to maximize the value derived from its

connection with cannabis, which might be characterized as an indirect way to "profit from" the cannabis business.

On the other hand, this interpretation of section 856(a) of the CSA goes too far. Debtor's passive ownership of stock, with intent to liquidate that stock to pay creditors, will *terminate* any connection with cannabis. This appears to be the opposite of an intent to profit from an ongoing scheme to distribute cannabis, at least if Debtor does not maintain its investment in Lowell Farms, Inc. for too long a period of time (which is an issue that can be addressed in connection with confirmation of any chapter 11 plan). Therefore, the UST has not established a violation of section 856(a) of the CSA.

### ii. No future investment of profits from cannabis

Similarly, although the UST has shown that Debtor's prepetition receipt of stock in its acquiring entity probably violated section 854 of the CSA, the UST has not established a likelihood of any postpetition violation from use or investment of cannabis proceeds. Section 854 of the CSA makes it illegal for a "person who has received any income derived, directly or indirectly, from [a relevant violation of the CSA]" to "use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise [engaged in or affecting interstate commerce]." *See* MTD p. 11:21-28 at n. 5 (quoting statute). Debtor does not propose, postpetition, to use any of its remaining assets to "invest" in any enterprise (cannabis-related or otherwise). Instead, Debtor proposes to sell the stock and distribute the resulting cash to creditors, or else transfer the stock directly to creditors.

### iii. No showing that a future trustee would have to violate the CSA

The UST raises the specter that any future bankruptcy trustee would have to engage in illegal activity. But the UST does not explain how a trustee would have to violate the CSA or any other law.

For example, even if Debtor still had possession of any cannabis or marijuana products (which it does not), a trustee could "ask[] the responsible federal authorities to

-6-

dispose of the estate's marijuana" and then fulfill the trustee's statutory duty to "liquidat[e] other estate property for distribution to creditors in accordance with the priorities of [§] 726." Steven J. Boyajian, <u>Just Say No to Drugs? Creditors Not Getting a Fair Shake When Marijuana-Related Cases are Dismissed</u>, 36 Am. Bankr. Inst. J. 24, 75 & n. 21 (Sept. 2017).

Moreover, it is not a foregone conclusion that the rights of any federal governmental unit to seize assets would supersede creditors' rights. *See id.* at 75 (text accompanying nn. 28-32). Therefore, not only has the UST failed to show that a future trustee would have to violate the CSA but, to the contrary, it appears that any future trustee probably might have a duty to administer assets rather than simply turn them over to federal authorities.

In addition, if any future trustee were concerned about any of these issues, the trustee could seek declaratory relief or other protections to assure compliance with the law and protection from liability. Alternatively, the trustee could always seek dismissal of this case at that point.

For all of the foregoing reasons, the UST has not established any ongoing violation of the CSA, nor has the UST established that any future trustee would have to violate the CSA. The lack of any demonstrated illegality, now or in the foreseeable future, is one ground for denial of the MTD.[3]

**d. Alternatively, Congress did not adopt a "zero tolerance" policy under § 1112(b) for any illegality**

Supposing for the sake of discussion that the UST could establish a violation of the CSA (which it has not done), that it not enough. Congress did not adopt a "zero

---

[3] To be clear, Debtor's apparent ownership of over 9% of the stock of a cannabis business puts it in uncomfortably close proximity to the cannabis industry. Perhaps, if all the facts and circumstances were known to this Bankruptcy Court, and if this Bankruptcy Court were to engage in independent research beyond the authorities cited by the parties, Debtor's proposed liquidation actually would be a violation of the CSA or some other criminal statute.

But this Bankruptcy Court has not been asked to render any summary judgment as to purported violations of criminal law, and this Bankruptcy Court's rulings above should not be interpreted as any such summary judgment. Rather, on the present record and solely for purposes of the UST's MTD, no violation of the CSA has been established.

tolerance" policy that requires dismissal of any bankruptcy case involving violation of the CSA (or other activity that might be proven to be illegal). *See Burton*, 610 B.R. at 637 (no per se rule requiring dismissal when marijuana is present).

True, Congress has enacted the CSA and this Bankruptcy Court's duty is to follow Congressional directives. On the other hand, Congress has not specified what should be the *bankruptcy-specific* remedy for any violation of the CSA.

Congress could have included within the examples of "cause" in § 1112(b)(4) a violation of the CSA, or any other nonbankruptcy laws, but it chose not to do so. This implies that violations of nonbankruptcy laws do not *necessarily* constitute cause for dismissal or conversion.

In addition, such a broad reading of "cause" for dismissal could be extremely disruptive in other cases before this Bankruptcy Court, perhaps even the vast majority of all bankruptcy cases. *See, e.g., In re CWNevada LLC*, 602 B.R. 717, 728 n. 25 (Bankr. D. Nev. 2019) ("bankruptcy courts have a long history of considering cases whose activities and operations have included past, present and possibly ongoing violations of applicable non-bankruptcy, civil and criminal laws") (citing examples); Hon. Keith M. Lundin (Ret.), Up in Smoke, Bankruptcy Workshop, Season 2, Episode 3, available at https://lundinonchapter13.com/Content/WorkshopVideos (last visited on January 18, 2023) (noting bankruptcy courts' and trustees' statutory mandate to administer assets, and extensive history of doing so notwithstanding some connection to illegal activity).

Dismissing every case that had a connection with illegal activity would be contrary to Congress' directives under the Bankruptcy Code. Consider what would happen if the doors of the bankruptcy courts were closed to any debtor who had crossed the line into illegal activity prepetition, and were attempting to wind up that activity postpetition.

Some of the largest business bankruptcy cases, like those of Pacific Gas & Electric Co. of "Erin Brockovich" *fame*, Enron Corporation, and Bernie Madoff, involve

alleged or actual criminal activity. Should those cases have been dismissed? How about cases involving sexual abuse? *See CWNevada,* 602 B.R. at 728 n. 25 (citing, *inter alia,* NCR Staff, Catholic Diocese and Orders that Filed for Bankruptcy and Other Major Settlements, National Catholic Reporter (2018), https://www.ncronline.org/news/catholic-dioceses-and-orders-filed-bankruptcy-and-other-major-settlements (last visited on January 18, 2023) (listing numerous bankruptcy proceedings to address sexual abuse claims, from July 6, 2004 through approximately February 28, 2018)).

On a smaller scale, this Bankruptcy Court takes judicial notice that many small business bankruptcies involve restaurants or small apartment buildings, and most of those businesses have at least some ongoing level of violations of health and safety regulations. When dealing with food and shelter, although it is important to strive for perfection, realistically that goal can be extremely difficult to achieve.

Likewise, many individual debtors have crossed the line into illegality in ways both large and small, from engaging in criminal gang activity to failing to pay taxes or parking fines. This Bankruptcy Court takes judicial notice that individuals who are struggling financially may have difficulty paying parking fines, for example, and there are societal debates about the criminalization of nonpayment of such fines, so barring such a debtor from bankruptcy would not be a step to take lightly.

If all of the foregoing examples were sufficient "cause" for mandatory dismissal, this Bankruptcy Court might have to dismiss most bankruptcy cases. That would harm the constituencies that Congress attempted to protect using all of the tools of the Bankruptcy Code, including creditors, debtors, employees of debtors, and local governments and communities that depend on debtors' ability to reorganize their finances and resume making contributions to commerce and society.

For example, the automatic stay of § 362(a) protects creditors from a "race to collect": absent that stay the assets go to anyone who is able to seize them before other creditors. Insiders or other favored creditors might have an advantage in doing so,

contrary to Congress attempts to prevent such favoritism.  *See, e.g.,* § 547(b)(4) (longer "look back" period for preference recipients who are insiders).

In addition, an orderly liquidation in bankruptcy typically maximizes the value of a debtor's assets.  Bankruptcy can preserve going concern value, or can authorize a sale of assets free and clear of liens and other interests, thereby obtaining higher bids than outside of bankruptcy.  *See, e.g.,* §§ 363(f) *and* 1129(b)(2)(A)(ii), *and see also In re Olson,* 2018 WL 989263 at *7 (9th Cir. BAP Feb. 5, 2018) (Tighe, J., concurring) (noting the usefulness of sales free and clear, even in cases connected to marijuana).

In addition, dismissal of bankruptcy cases would shield recipients of avoidable transfers (*e.g.,* §§ 547, 548) and persons whose misdeeds might only come to light in the bankruptcy forum, with all of its mandated disclosures and investigative tools.  *See, e.g.,* Rules 1007 & 2004; *see also* Boyajian, Just Say No to Drugs?, *supra,* 36 Am. Bankr. Inst. J. 24 at 75 (text accompanying nn. 22-27) (arguing that dismissal of involuntary chapter 7 petition allowed "the alleged debtor to use its own federally proscribed conduct [running a marijuana business] as a shield to protect it from the collection efforts of creditors holding seemingly undisputed claims").  This Bankruptcy Court doubts that Congress intended to shield recipients of avoidable transfers, and wrongdoers, by mandating dismissal of any bankruptcy case that might be connected to violations of criminal law.

In fact, in many situations the victims of illegal activity are the persons who might be most severely harmed by dismissal of any bankruptcy case.  This is true whether that illegal activity involves releasing carcinogens into the water supply, financial fraud, being a "slumlord," causing food poisoning, abusing employees, child sexual abuse, or other criminal activity.  The victims may be the biggest creditors, or those with the most to lose.

One other type of creditor who might well be harmed by any mandated dismissal of any case connected to illegal activity is any government agency charged with enforcing the law, such as the Department of Justice, which encompasses the Office of the UST itself.  Such agencies' funding, and their ability to continue policing against

criminal activity, might depend in part on the preservation and recovery of assets, including through bankruptcy.

For all of these reasons, this Bankruptcy Court does not interpret Congress' mandate that this Bankruptcy Court "shall" dismiss or convert a bankruptcy case for "cause" under § 1112(b) to mean that any violation of criminal law *requires* dismissal. Rather, this Court interprets the statute as giving discretion to determine whether dismissal is warranted based on all the facts and circumstances. *See generally Burton*, 610 B.R. 633, 640 *and passim* (review of various authorities, and referring to bankruptcy courts' "broad discretion in deciding whether to dismiss a case").

Nor does this Bankruptcy Court interpret the UST's MTD to advocate for such an extreme position. *Cf.* Clifford J. White III and John Sheahan, Why Marijuana Assets May Not Be Administered In Bankruptcy, 36 Am. Bankr. Inst. J. 34, 34-35 (Dec. 2017) (contrasting bankruptcy cases "in which the criminal activity has already been terminated and the principal concern of the bankruptcy court is to resolve competing claims by victims for compensation" from a case involving "a company that is not only continuing in its business, but even seeking the affirmative assistance of the bankruptcy court in order to … facilitate its violations of the law going forward") (the authors are listed, respectively, as the director of the Executive Office for U.S. Trustees and as a trial attorney in the Office of the General Counsel).

In sum, this Bankruptcy Court interprets both § 1112(b) and the UST's MTD as adopting a middle ground, under which this Bankruptcy Court must exercise its discretion to determine whether, given all of the facts and circumstances, a debtor's connection to cannabis profits and any past or future investment in cannabis enterprises warrants dismissal of this bankruptcy case. Under this standard, the UST has not met its burden to establish sufficient cause for dismissal, for the reasons stated above, including (i) Debtor's indirect connection with any violation of the CSA (assuming, contrary to this Court's analysis in the prior section of this Opinion, that such a violation

exists), (ii) Debtor's intent to liquidate its assets and pay creditors, and (iii) the benefits of a bankruptcy case for all parties in interest, including creditors.

### e. Alternatively, the "unusual circumstances" exception applies

Congress has provided that even when there is "cause" to dismiss or convert a case, this Bankruptcy Court must not to do so under the "unusual circumstances" test described above. *See* § 1112(b)(2). The elements of this test have been satisfied, at least in the absence of evidence that prosecutors intend to single out Debtor for particularly harsh treatment that would undermine any ability to pay creditors and otherwise make appropriate use of the bankruptcy system.

Specifically, the unusual circumstances in this case are as follows. First, Debtor has divested itself, prepetition, of any direct involvement in the cannabis business. Second, unlike most dismissals by this Court, which generally involve situations such as a pending foreclosure of fully-encumbered property and no realistic possibility of a distribution to unsecured creditors, in this case any dismissal would undermine a very realistic possibility of a substantial payment to creditors. That successful outcome appears to be very likely because the only thing for Debtor to do is to sell its stock in the Canadian company, which appears to be legal and feasible under Canadian law, and then to use the proceeds to pay creditors; or alternatively to distribute the stock to creditors.

These facts also establish the other elements of the "unusual circumstances" test: conversion or dismissal is not in the best interests of creditors; there is a reasonable likelihood of confirming a plan in a reasonable amount of time; even if Debtor's acts and omissions in seeking to divest itself of its assets and pay creditors somehow violated the CSA or other law, and would otherwise mandate dismissal, Debtor's attempt to maximize value and pay creditors establishes a "reasonable justification" for such acts and omissions; and, so long as Debtor's process of selling or distributing its stock in the Canadian company does not take too long, any violation of

law can be "cured within a reasonable time." *Rosenblum*, 608 B.R. at 536-37 (reviewing elements of § 1112(b)(2)).

In addition, this Bankruptcy Court is mindful of the fact that there are many other tools to address any wrongful or illegal conduct by any debtor in possession of the bankruptcy estate. For example, in appropriate circumstances a trustee or examiner can be appointed (§ 1104), or sanctions can be imposed. *See, e.g.,* Rule 9011. The availability of such alternatives reinforces a more flexible interpretation of § 1112 as just one of many possible tools, not a tool that this Bankruptcy Court has to use regardless of the consequences.

In addition, this Bankruptcy Court notes that there are many non-bankruptcy tools that can be used to address any illegal activity. Remedies can be sought, in appropriate situations, by prosecutors, private attorneys general, class action representatives, individual plaintiffs, and others, such as local, state, and national governments, to address any violations of nonbankruptcy law in a more nuanced and targeted manner than the blunt tool of dismissing bankruptcy cases. Again, the availability of such alternatives reinforces this Bankruptcy Court's interpretation of § 1112(b) as providing some discretion: dismissal is not the only remedy.

### f. No intent to condone illegal activity

To be clear, nothing in this Opinion should be interpreted as condoning illegal activity. Illegal activity can be cause for dismissal in appropriate circumstances, both as a matter of interpreting Congress' directives in § 1112(b) and, more generally, to preserve the integrity of the bankruptcy system and the bankruptcy courts that Congress has established. *See, e.g., In re Mattiace Industries, Inc.,* 76 B.R. 44, 47-48 (Bankr. E.D.N.Y. 1987) (dismissing chapter 11 bankruptcy case because debtor's continued violations of state environmental regulations endangered public health and conversion was inappropriate due to difficulties a trustee would face in managing debtor's hazardous waste site with limited estate resources)

But this Bankruptcy Court would be overstepping its role, and acting contrary to Congress' directives within the Bankruptcy Code, if it were to deny creditors, debtors, employees, equity investors, and other constituencies the benefits and protections of bankruptcy based on the facts and circumstances presented. In general this Bankruptcy Court should defer to prosecutors, and all of the other types of persons mentioned above, to use their discretion about whether and how to address any violations of nonbankruptcy law. *See Cook Investments,* 922 F.3d 1031, 1036 (rejecting "ombudsman" role of bankruptcy court). Such parties can pursue remedies in a more nuanced and targeted manner, rather than using the blunt tool of dismissal, which on the record presented is contrary to the best interests of creditors and the estate.

**4. CONCLUSION**

For all of the foregoing reasons, the MTD has been denied by separate order.

###

Date: January 20, 2023

Neil W. Bason
United States Bankruptcy Judge