# FOR PUBLICATION

FILED & ENTERED

SEP 20 2023

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY sumlin    DEPUTY CLERK

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**LOS ANGELES DIVISION**

| | |
|---|---|
| In re:<br><br>The Hacienda Company, LLC,<br><br><br><br><br><br><br><br>Debtor(s) | Case No.:    2:22-bk-15163-NB<br><br>Chapter:    11<br><br>**OPINION DENYING MOTION TO DISMISS CASE BASED ON CONNECTIONS WITH CANNABIS**<br><br>Hearing Date:<br>Date:  July 11, 2023<br>Time: 2:00 p.m.<br>Place: Courtroom 1545<br>        255 E. Temple Street<br>        Los Angeles, CA 90012<br>(or via Zoomgov per posted procedures) |

The United States Trustee ("UST") has filed his second motion to dismiss the above-captioned Debtor's bankruptcy case based on connections with cannabis (the "Second MTD").[1]  For the following reasons, the Second MTD will be denied by separate order.

The UST characterizes a Bankruptcy Court-supervised process of maximizing

---

[1] Unless the context suggests otherwise, a "chapter" or "section" ("§") refers to the United States Bankruptcy Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code"), a "Rule" means the Federal Rules of Bankruptcy Procedure or other federal or local rule, and other terms have the meanings provided in the Bankruptcy Code, Rules, and the parties' filed papers.

1 payments to creditors through a chapter 11 plan as a "conspiracy" to violate federal
2 criminal laws and "money laundering," because Debtor proposes to pay creditors out of
3 assets derived from allegedly criminal activity.  But it would be odd to the read the
4 Bankruptcy Code as implicitly barring any payments to legitimate creditors when that is
5 what federal criminal law itself provides.

6 The UST argues that this case is different because the underlying criminal
7 activity is continuing postpetition.  But nothing that Debtor proposes to do postpetition
8 will foster a single additional sale of cannabis products, nor will it add a single dollar to
9 any cannabis-related enterprise.  All that Debtor will do is pay its creditors by selling its
10 stock, over time, in a company that is legally traded in Canada.

11 **1. Background**

12 The facts are largely undisputed.[2]  At one time Debtor was in the business of
13 wholesale manufacturing, packaging, and distribution of cannabis products to
14 dispensaries in California under the brand name "Lowell Herb Co.," a/k/a "Lowell
15 Farms."  In 2020 Debtor sold land that it had intended to use as a cannabis cultivation
16 center, and it used the proceeds to pay certain creditors.  On February 25, 2021, Debtor
17 ceased its operations.

18 Thereafter, Debtor transferred its assets to a publicly traded Canadian company,
19 which changed its name to Lowell Farms, Inc. ("Lowell Farms").  Lowell Farms' sole
20 business is cannabis growth and sales.

21 Those cannabis activities apparently are perfectly legal under Canadian and
22 California law.  But they include operations in the United States that probably are illegal
23 under United States federal law.

24 In return for Debtor's transfer of assets it received roughly a 9.4% share of Lowell
25 Farms' shares, valued at approximately $35 million at the time of sale.  But Debtor has

26

27 _____

[2] The declaration of Michael Jones is helpful as argument, but this Court grants Debtor's motion to strike it
insofar as it is offered as evidence.  Alternatively, even if the statements in the Jones declaration were
28 treated as admissible evidence, that would not change the outcome.

no seat on the board of Lowell Farms, and no control over Lowell Farms' management or business, apart from its voting rights as a minority equity holder.

Debtor filed its voluntary chapter 11 bankruptcy petition roughly 18 months after it ceased operations, on September 21, 2022 (the "Petition Date"). In Debtor's initial status report, it stated that it intended "to propose a plan of reorganization that provides for Debtor to sell off the shares of [Lowell Farms that] it owns in an orderly fashion and use the proceeds from the stock to pay creditors …." Debtor's counsel elaborated at a prior hearing that the stock of Lowell Farms is thinly traded and therefore, to avoid flooding the market and depressing the return to creditors, "we're talking about selling off in chunks [over time] …." Tr. 12/20/23 (dkt. 76), p. 16:19.

Debtor's intent has been embodied in a chapter 11 liquidating plan. The current version of that plan (docket no. 129, modified by docket no. 178, pp. 3:21-4:7, the "Plan") proposes to:

> sell [Debtor's] shares [of Lowell Farms] on the [Canadian Securities Exchange] or in any other orderly manner, and distribute the funds received from the sale to [Debtor's] creditors on a pro rata basis, with any amounts obtained in excess of the total amount required to pay all allowed claims in full being distributed to the holders of equity interests in the Debtor. [Plan, p. 5:22-25].

On November 29, 2022, the UST filed his first motion to dismiss this case under § 1112(b) (the "First MTD"). The UST essentially argued that Debtor itself was effectively engaged in the sale of cannabis products, or a conspiracy to do so, in violation of The Controlled Substances Act, 21 U.S.C. § 801 et seq. (the "CSA"). This Bankruptcy Court was not persuaded that the UST had met his burden as to Debtor's postpetition allegedly criminal activity, but added:

> Perhaps, if all the facts and circumstances were known to this Bankruptcy Court, and if this Bankruptcy Court were to engage in independent research beyond the authorities cited by the parties, Debtor's proposed liquidation actually would be a violation of … some … criminal statute. … [But] on the present record and solely for purposes of the UST's [First] MTD, no [such] violation … has been established. [*In re Hacienda Co., LLC,* 647 B.R. 748, 754 n. 3 (Bankr. C.D. Cal. 2023).]

On May 31, 2023, the UST filed his Second MTD.  This time the UST cites authority that Debtor has not taken sufficient steps to withdraw from an ongoing conspiracy to violate the CSA.  He also argues that Debtor's amended Plan violates 18 U.S.C. §§ 1956 and 1957 (the "Money Laundering Statutes").

The Second MTD and the confirmation hearing on Debtor's Plan came on for hearing together, at the above-captioned date and time.  This Court is issuing a separate decision holding that Debtor's Plan will be confirmed.  There is some overlap in the analysis, because one ground for the Second MTD is that Debtor cannot confirm any chapter 11 plan due to its connections with cannabis.

## 2.  Jurisdiction, authority, and venue

This Bankruptcy Court has jurisdiction to decide the Second MTD, venue is proper, and this is a "core" proceeding in which a final judgment or order can be issued. *See Hacienda,* 647 B.R. 748, 750.

## 3.  Revisiting the Issues

The parties dispute whether the Second MTD is effectively a motion for reconsideration, which must satisfy the standards under Rule 60(b) Fed. R. Civ. P. (made applicable by Rule 9024).  Under Rule 60(b), this Bankruptcy Court may provide relief from its prior order based on "<u>mistake</u> [the ground on which the UST appears to focus], inadvertence, surprise, or excusable neglect" (Rule 60(b)(1), emphasis added) or "newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b)."  Rule 60(b)(2).

### a.  Rule 60(b) applies

The UST argues that this Bankruptcy Court "was under the [mis]impression that the sale was structured to sell [only] intellectual property," when in fact the sale included marijuana flowers[3] and other drug-related assets.  Reply (dkt. 160), pp. 5:18-23 and

---

[3] The CSA classifies "marihuana" and "Tetrahydrocannabinols" as Schedule I substances.  21 U.S.C. § 812(c).  So as not to interpret federal criminal law too narrowly, this Opinion uses the broad term "cannabis," which apparently refers to all products derived from the plant Cannabis Sativa, rather than the narrower term "marijuana," which apparently refers only to parts of or products from the plant that contain substantial amounts of tetrahydrocannabinol ("THC") – the substance that is primarily responsible for the

6:14.  The UST is correct that this Court mistakenly overlooked the evidence that Debtor sold more than just intellectual property, and conceivably that could have changed this Court's views.  This is one reason to take a fresh look at the situation.

### b. Discretionary fresh look

Alternatively, even if the UST had not met the standards under Rule 60(b) (which he has), this Bankruptcy Court has *discretion* to take a fresh look at the situation.  *See, e.g., In re White Crane Trading Co.,* 170 B.R. 694, 701 (Bankr. E.D. Cal. 1994).  This Court will exercise that discretion in view of the UST's more robust arguments in the Second MTD about alleged violations of federal criminal law, and because of this Court's previously expressed doubts on the issue.  *See Hacienda,* 647 B.R. 748, 754 at n. 3 *and* at 757-58.

### 4. Legal standards

The legal standards under § 1112(b) are set forth in this Court's prior opinion:

> [T]he burden of establishing "cause" for dismissal under § 1112(b) rests with the party seeking dismissal.  *See In re Rosenblum,* 608 B.R. 529, 536 (Bankr. D. Nev. 2019).  The movant must show such cause by "a preponderance of the evidence."  *In re Woodbrook Assocs.,* 19 F.3d 312, 317 (7th Cir. 1994).
>
> If the movant establishes that "cause" exists under § 1112(b)(1), then the opponent can still prevent conversion or dismissal under § 1112(b)(2) if (1) the court "finds and specifically identifies unusual circumstances establishing" that conversion or dismissal is "not in the best interests of creditors"; (2) the opponent shows that "there is a reasonable likelihood" of confirming a plan in a reasonable amount of time; (3) the opponent establishes that the grounds for conversion or dismissal include an act or omission of the debtor for which there is a "reasonable justification"; and (4) the opponent establishes that the act or omission can be "cured within a reasonable time."  *Rosenblum,* 608 B.R. at 536-37 (summarizing § 1112(b)(2)).
>
> If the debtor cannot satisfy the "unusual circumstances" elements under § 1112(b)(2), then the bankruptcy court must choose between conversion or dismissal based on the best interests of the creditors and the estate.  *In re Nelson,* 343 B.R. 671, 675 (9th Cir. BAP 2006) (citation and internal quotation marks omitted).
>
> * * *

---

effects of marijuana on a person's mental state.  But for purposes of this Opinion the terminology makes no difference.  *See* www.nccih.nih.gov/health/cannabis-marijuana-and-cannabinoids-what-you-need-to-know (last checked 9/18/2023).  *See* Second MTD, p. 6, fn. 4.

A violation of nonbankruptcy law is not expressly listed as "cause" for dismissal under § 1112(b)(1) & (4), but compliance with applicable nonbankruptcy law generally is required both by statute (*e.g.,* 28 U.S.C. § 959) and under the authorities cited by both parties, so it appears to be undisputed that violations of nonbankruptcy law *can* be cause for dismissal.  That said, there are many remedies for any debtor's violations of any law, rule, or procedure, and dismissal is one of the more extreme remedies.

There are several alternative reasons why violations of nonbankruptcy law might establish cause for dismissal.  First, such violations might establish a lack of "good faith" sufficient to warrant dismissal.  *See, e.g., In re Arenas,* 535 B.R. 845 (10th Cir. BAP 2015) (debtors' marijuana business, while legal under state law, was illegal under federal law, and thus the debtors could not propose a confirmable plan in good faith).  *See generally In re Leavitt,* 171 F.3d 1219, 1224 (9th Cir. 1999) ("cause" for dismissal not defined by the [Bankruptcy] Code, but can include "bad faith"/lack of "good faith"); *Rosenblum,* 608 B.R. at 537 (listing common considerations in assessing good faith).

Second, violations of nonbankruptcy law might constitute "gross mismanagement" of the estate, within the meaning of § 1112(b)(4)(B), because violations of nonbankruptcy law might expose the estate to financial losses and criminal sanctions, and violating the law might constitute "mismanagement" *per se*.  *See, e.g., In re Rent-Rite Super Kegs West Ltd.,* 484 B.R. 799, 809 (Bankr. D. Colo. 2012) (Debtor's decision to continue leasing warehouse space to tenants engaged in the business of growing marijuana exposed Debtor to criminal liability and the risk of forfeiture which amounted to gross mismanagement).

In addition, violations of nonbankruptcy law might warrant dismissal under general principles applicable to a bankruptcy court as a court of equity, pursuant to bankruptcy judges' oath of office to uphold the law, or on other theories.  *See, e.g., In re Johnson,* 532 B.R. 53, 56-58 (Bankr. W.D. Mich. 2015) (suggesting that authorizing debtor to continue generating income from marijuana operations appears inconsistent with judicial oath to uphold the law, but concluding that Debtor could remain in bankruptcy and avoid dismissal of his case if he ceased marijuana operations).  *See also* [First] MTD (docket no. 53) pp. 8:18-17:11; Opp. (docket no. 59) pp. 3:6-19:26; *and* Reply (docket no. 63) pp. 7:22-11:14 (discussing authorities).

But the authorities cited by the parties also appear to reflect some degree of discretion.  Ongoing postpetition violations are far more problematic than prepetition violations; and although indirect connections with illegal activity might violate nonbankruptcy law, the degree of connection appears to be important to deciding whether to dismiss the case.  *See e.g., In re Burton,* 610 B.R. 633, 637-638 (9th Cir. BAP 2020) (affirming dismissal as within bankruptcy court's discretion, but holding that "the mere presence of marijuana near a bankruptcy case does not automatically prohibit a debtor from bankruptcy relief," so a "bankruptcy court must be explicit in articulating its legal and factual bases for dismissal in cases involving marijuana") (citations omitted); *and see also*

*Garvin v. Cook Investments NW, SPNWY, LLC,* 922 F.3d 1031, 1036 (9th Cir. 2019) (bankruptcy judge is not an "ombudsman without portfolio, gratuitously seeking out 'illegalities' ..., a result that would be "inimical to the basic function of bankruptcy judges ...") (footnote, citations, and internal quotation marks omitted).
[*Hacienda,* 647 B.R. 748, 751-52 (citations and internal quotation marks omitted; all formatting in original).]

**5. Discussion**

As a preliminary matter, the UST only refers to "likely" violations of criminal law. He does so because the standard for dismissal under § 1112 and confirmation under § 1129 is "preponderance of the evidence" rather than "beyond a reasonable doubt," which typically applies under criminal law.  The UST's approach of avoiding any actual conclusions of criminal law is appropriate, because this is not a criminal proceeding, and this Bankruptcy Court has no authority to preside over criminal proceedings.

**a. The UST has established probable violations of the CSA**

**i. Prepetition: Debtor apparently engaged in an ongoing conspiracy in violation of the CSA**

Under the CSA:

> Except as authorized by this title, it shall be unlawful for any person knowingly or intentionally – (1) to <u>manufacture, distribute, or dispense, or possess</u> with intent to manufacture, distribute, or dispense, a controlled substance [such as cannabis] …. [21 U.S.C. § 841(a)(1) (emphasis added)]
> …
> Except as authorized by this title, it shall be unlawful to – (1) knowingly <u>open, lease, rent, use, or maintain any place</u>, whether permanently or temporarily, for the purpose of manufacturing, distributing, or using any controlled substance…. [21 U.S.C. § 856(a)(1) (emphasis added)]

Debtor itself ceased doing any of these things eighteen months before the Petition Date.  But before that Debtor was in the business of wholesale manufacturing, packaging and distribution of cannabis products, which likely violated the above-quoted provisions of the CSA.

The UST argues that Debtor continued to violate the CSA by transferring its assets to Lowell Farms and taking back its stock, thereby allegedly participating in a conspiracy with Lowell Farms:

-7-

> Any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.  [21 U.S.C. § 846]

To prove a conspiracy under section 846, "the government must prove beyond a reasonable doubt that (1) there existed an agreement between two or more persons to possess with intent to distribute or to distribute [the controlled substance] and (2) [the defendant] joined the agreement knowing of its purpose and intending to help accomplish that purpose." *United States v. Jaimez*, 45 F.4th 1118, 1123 (9th Cir. 2022). This Court concludes (again, solely for purposes of ruling on the Second MTD) that more likely than not a federal prosecutor could obtain a verdict against Debtor for a prepetition conspiracy to violate the above-quoted provisions of the CSA based on (A) Debtor's transfer of its assets to Lowell Farms, (B) its receipt of Lowell Farms' stock worth an estimated $35 million at the time of the sale, and (C) its continued possession of that stock, knowing that Lowell Farms intended to continue growing and selling cannabis.

### ii. Postpetition: Debtor probably has not withdrawn from the alleged conspiracy to violate the CSA

The UST argues that Debtor has not shown a clear, definite, and affirmative act to withdraw from the alleged conspiracy.  *See* Second MTD (dkt. 150), pp. 14:19-16:2 (citing *Hyde v. U.S.*, 225 U.S. 347, 369 (1912)); *see also U.S. v. Loya,* 807 F.2d 1483, 1493 (9th Cir. 1987) ("Withdrawal from a conspiracy requires a disavowal of the conspiracy or an affirmative action that would have defeated the purpose of the conspiracy, or <u>definite, decisive and positive steps</u> to show that the conspirator's disassociation from the conspiracy is sufficient") (citation and internal quotation marks omitted; emphasis added).

On the one hand, Debtor arguably has taken, in the UST's words, "clear, definite, and affirmative acts" to terminate its involvement in any conspiracy by the very acts of filing its bankruptcy petition and proposing its liquidating Plan to sell off its holdings of

Lowell Farms' stock. *See, e.g., U.S. v. U.S. Gypsum Co.,* 438 U.S. 422, 464-65 (1978) ("Affirmative acts inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach co-conspirators have generally been regarded as sufficient to establish withdrawal or abandonment") (citations omitted).

On the other hand, Debtor has admitted that it does not intend immediately to sell off its stock in Lowell Farms, but rather to sell the stock in "chunks [over time]" so as to avoid flooding the market and depressing the stock's value. Tr. 12/20/23 (dkt. 76), p. 16:19. This gradual divestment means that Debtor probably will not have undertaken sufficient acts to withdraw from the apparent conspiracy until all the stock is sold. *See, e.g., Reisman v. U.S.*, 409 F.2d 789, 793 (9th Cir. 1969) ("Although appellant Reisman resigned as president and director … and ceased to participate in the company's day-to-day business operations, he remained a major stockholder and took no affirmative action to disavow or defeat the promotional activities which he had joined in setting in motion. We think more was required to terminate his liability for the continuing conduct of his confederates"); *U.S. v. Sax,* 39 F.3d 1380, 1385 (7th Cir. 1994) (rejecting argument that defendant withdrew from marijuana distribution conspiracy "at the moment he sold his business" because he "continued to wholeheartedly endorse the purpose of the marijuana conspiracy – making profits from drug sales").

### iii. Conclusion as to the CSA

Unlike the First MTD, this Second MTD has carried the UST's burden to establish that, more likely than not, Debtor is engaged in a postpetition violation of the CSA by not withdrawing from a prepetition conspiracy with Lowell Farms to profit from its business involving controlled substances. But, as previously discussed by this Court, even assuming that there is any postpetition violation of criminal law, that does not necessarily mean the appropriate remedy is to dismiss this bankruptcy case.

### b. Congress did not adopt a "zero tolerance" policy under § 1112 for any illegality

This Court previously addressed the UST's arguments as follows:

Congress did not adopt a "zero tolerance" policy that requires dismissal of any bankruptcy case involving violation of [any criminal law]. *See Burton,* 610 B.R. [633] at 637 (no per se rule requiring dismissal when marijuana is present).

True, Congress has enacted the CSA [and other criminal laws] and this Bankruptcy Court's duty is to follow Congressional directives.  On the other hand, Congress has not specified what should be the *bankruptcy-specific* remedy for any violation of the CSA [or other criminal law].

Congress could have included within the examples of "cause" in § 1112(b)(4) a violation of the CSA, or any other nonbankruptcy laws, but it chose not to do so.  This implies that violations of nonbankruptcy laws do not *necessarily* constitute cause for dismissal or conversion.

In addition, such a broad reading of "cause" for dismissal could be extremely disruptive in other cases before this Bankruptcy Court, perhaps even the vast majority of all bankruptcy cases.  *See, e.g., In re CWNevada LLC,* 602 B.R. 717, 728 n. 25 (Bankr. D. Nev. 2019) ("bankruptcy courts have a long history of considering cases whose activities and operations have included past, present and possibly ongoing violations of applicable non-bankruptcy, civil and criminal laws") (citing examples); Hon. Keith M. Lundin (Ret.), Up in Smoke, Bankruptcy Workshop, Season 2, Episode 3, available at https://lundinonchapter13.com/Content/WorkshopVideos (last visited on September 18, 2023) (noting bankruptcy courts' and trustees' statutory mandate to administer assets, and extensive history of doing so notwithstanding some connection to illegal activity).

Dismissing every case that had a connection with illegal activity would be contrary to Congress' directives under the Bankruptcy Code.  Consider what would happen if the doors of the bankruptcy courts were closed to any debtor who had crossed the line into illegal activity prepetition, and were attempting to wind up that activity postpetition.

Some of the largest business bankruptcy cases, like those of Pacific Gas & Electric Co. ["PG&E"] of "Erin Brockovich" fame [and, more recently, infamous for its role in wildfire deaths], Enron Corporation, and Bernie Madoff, involve alleged or actual criminal activity.  Should those cases have been dismissed?  How about cases involving sexual abuse? *See CWNevada,* 602 B.R. at 728 n. 25 (citing, *inter alia,* NCR Staff, Catholic Diocese and Orders that Filed for Bankruptcy and Other Major Settlements, National Catholic Reporter (2018), Catholic dioceses and orders that filed for bankruptcy and other major settlements | National Catholic Reporter (ncronline.org) (last visited on September 18, 2023) (listing numerous bankruptcy proceedings to address sexual abuse claims, from July 6, 2004 through approximately February 28, 2018)).

On a smaller scale, this Bankruptcy Court takes judicial notice that many small business bankruptcies involve restaurants or small apartment buildings, and most of those businesses have at least some ongoing level of violations of health and safety regulations.  When dealing with food and shelter, although it is important to strive for perfection, realistically that goal can be extremely difficult to achieve.

Likewise, many individual debtors have crossed the line into

-10-

illegality in ways both large and small, from engaging in criminal gang activity to failing to pay taxes or parking fines.  This Bankruptcy Court takes judicial notice that individuals who are struggling financially may have difficulty paying parking fines, for example, and there are societal debates about the criminalization of nonpayment of such fines, so barring such a debtor from bankruptcy would not be a step to take lightly.

If all of the foregoing examples were sufficient "cause" for mandatory dismissal, this Bankruptcy Court might have to dismiss most bankruptcy cases.  That would harm the constituencies that Congress attempted to protect using all of the tools of the Bankruptcy Code, including creditors, debtors, employees of debtors, and local governments and communities that depend on debtors' ability to reorganize their finances and resume making contributions to commerce and society.

For example, the automatic stay of § 362(a) protects creditors from a "race to collect": absent that stay the assets go to anyone who is able to seize them before other creditors.  Insiders or other favored creditors might have an advantage in doing so, contrary to Congress attempts to prevent such favoritism.  *See, e.g.,* § 547(b)(4) (longer "look back" period for preference recipients who are insiders).

In addition, an orderly liquidation in bankruptcy typically maximizes the value of a debtor's assets.  Bankruptcy can preserve going concern value, or can authorize a sale of assets free and clear of liens and other interests, thereby obtaining higher bids than outside of bankruptcy.  *See, e.g.,* §§ 363(f) *and* 1129(b)(2)(A)(ii), *and see also In re Olson,* 2018 WL 989263 at *7 (9th Cir. BAP Feb. 5, 2018) (Tighe, J., concurring) (noting the usefulness of sales free and clear, even in cases connected to marijuana).

In addition, dismissal of bankruptcy cases would shield recipients of avoidable transfers (*e.g.,* §§ 547, 548) and persons whose misdeeds might only come to light in the bankruptcy forum, with all of its mandated disclosures and investigative tools.  *See, e.g.,* Rules 1007 & 2004; *see also* [Steven J.] Boyajian, *Just Say No to Drugs? [Creditors Not Getting a Fair Shake When Marijuana-Related Cases are Dismissed],* 36 Am. Bankr. Inst. J. 24, at 75 (text accompanying nn. 22-27) [Sept. 2017] (arguing that dismissal of involuntary chapter 7 petition allowed "the alleged debtor to use its own federally proscribed conduct [running a marijuana business] as a shield to protect it from the collection efforts of creditors holding seemingly undisputed claims"). This Bankruptcy Court doubts that Congress intended to shield recipients of avoidable transfers, and wrongdoers, by mandating dismissal of any bankruptcy case that might be connected to violations of criminal law.

In fact, in many situations the victims of illegal activity are the persons who might be most severely harmed by dismissal of any bankruptcy case.  This is true whether that illegal activity involves releasing carcinogens into the water supply [PG&E], [creating excessive fire risks (PG&E again),] financial fraud [Enron, Madoff], being a "slumlord," causing food poisoning, abusing employees, child sexual abuse, or other criminal activity. The victims may be the biggest creditors, or those with the most to lose.

One other type of creditor who might well be harmed by any mandated dismissal of any case connected to illegal activity is any government agency charged with enforcing the law, such as the Department of Justice, which encompasses the Office of the UST itself. Such agencies' funding, and their ability to continue policing against criminal activity, might depend in part on the preservation and recovery of assets, including through bankruptcy.

For all of these reasons, this Bankruptcy Court does not interpret Congress' mandate that this Bankruptcy Court "shall" dismiss or convert a bankruptcy case for "cause" under § 1112(b) to mean that any violation of criminal law requires dismissal. Rather, this Court interprets the statute as giving discretion to determine whether dismissal is warranted based on all the facts and circumstances. *See generally Burton,* 610 B.R. 633, 640 *and passim* (review of various authorities, and referring to bankruptcy courts' "broad discretion in deciding whether to dismiss a case").

Nor does this Bankruptcy Court interpret the UST's [First or Second] MTD to advocate for such an extreme position. *Cf.* Clifford J. White III and John Sheahan, *Why Marijuana Assets May Not Be Administered In Bankruptcy,* 36 Am. Bankr. Inst. J. 34, 34-35 (Dec. 2017) (contrasting bankruptcy cases "in which the criminal activity has already been terminated and the principal concern of the bankruptcy court is to resolve competing claims by victims for compensation" from a case involving "a company that is not only continuing in its business, but even seeking the affirmative assistance of the bankruptcy court in order to ... facilitate its violations of the law going forward[4]") (the authors are listed, respectively, as the director of the Executive Office for U.S. Trustees and as a trial attorney in the Office of the General Counsel).

In sum, this Bankruptcy Court interprets both § 1112(b) and the UST's [First and Second] MTD as adopting a middle ground, under which this Bankruptcy Court must exercise its discretion to determine whether, given all of the facts and circumstances, a debtor's connection to cannabis profits and any past or future investment in cannabis enterprises warrants dismissal of this bankruptcy case. Under this standard, the UST has not met its burden to establish sufficient cause for dismissal, for the reasons stated above, including (i) Debtor's indirect connection with any violation of the CSA [or other criminal law], (ii) Debtor's intent to liquidate its assets and pay creditors, and (iii) the benefits of a bankruptcy case for all parties in interest, including creditors.

[*Hacienda,* 647 B.R. 748, 754-56 (all formatting in original).]

In connection with the Second MTD the UST has focused on two additional arguments. First, he argues that federal courts generally close the courthouse doors when illegal contracts are involved. Second, he attempts to distinguish this case from the examples cited in the above block quotation on the ground that this case involves

---

[4] As discussed below, Debtor's mere ownership of Lowell Farms' stock has not been shown by the UST to do anything to "facilitate" any violations of the CSA "going forward."

ongoing postpetition illegality.

### i. Federal courts' approach to illegal contracts

The UST cites authority that, when private parties seek to enforce marijuana-related contracts, courts have held that they will not grant relief in many situations.  But even in such private-party situations there is some flexibility, as recognized by the authorities cited by the UST.  *See, e.g., J. Lilly, LLC v. Clearspan Fabric Structures Int'l, Inc.,* 2020 WL 1855190 at *12 (D. Or. Apr. 13, 2020) ("courts will enforce a contract related to marijuana when enforcing the contract does not require a party to violate the CSA") (citation omitted); *and cf., e.g., Sensoria, LLC v. Kaweske, et al.,* 2021 WL 103020 at *6 (D. Colo. Jan. 12, 2021) ("The simple fact that marijuana is involved does not mean the Plaintiffs' claims must be dismissed automatically….") (citations omitted).

In addition, as Debtor pointed out at oral argument, there is a difference between private parties and a bankruptcy case.  In the latter situation Congress has shown an intent not to "punish" a debtor when the real victims would be innocent creditors.  For example, Congress has subordinated payment of "any fine, penalty, or forfeiture" to the payment of other claims (§ 726(a)(4)), Congress has provided that liens securing such debts may be avoided and preserved for the benefit of other creditors (§§ 551 & 724(a)), and Congress has provided for tax liens to be used to pay various claims ahead of those taxes (§ 724(b)).

For all of these reasons, this Court is not persuaded that, in the circumstances of this case, any federal court policy of not condoning illegality should override Congress' mandates to administer bankruptcy cases, with all of the resulting benefits to innocent creditors and other parties in interest.  Dismissal of this bankruptcy case is not warranted on this ground.

### ii. Ongoing postpetition illegality

The UST has not disputed that Congress chose not to include a violation of criminal law as "cause" for which this Court "shall" dismiss this case under § 1112(b)(4).  Rather, at oral argument the UST argued that this case is different from the types of

bankruptcy cases listed in the above block quotation because Debtor's violation of criminal laws is continuing postpetition.  This Court is not persuaded.

First, the UST does not address the fact that the most common types of business bankruptcies, such as restaurants and landlords, typically do involve some ongoing violations of health and safety laws.  For that matter, many other business debtors, such as PG&E and Enron, did not instantaneously cease all criminal acts the moment they filed their bankruptcy petitions.

Carcinogens in the water supply (PG&E) continued to leach even if cleanup efforts were commenced right away; fire hazards continued to exist even if the debtor (PG&E again) immediately undertook better tree trimming; and fraudulent contracts (Enron) and Ponzi schemes (Madoff) took time unwind.  In all these examples, as in this case, it can take time postpetition to attempt to divest the debtor from any connection with ongoing illegality.  In other words, the UST's attempted distinction of those other cases from this one does not hold water.

Second, it is true that Debtor cannot instantly divest itself of Lowell Farms' stock and therefore, as this Court has concluded above, Debtor has not yet withdrawn from what is more likely than not an ongoing criminal conspiracy.  But, as Debtor asserted at oral argument, its mere ownership of Lowell Farms' stock during the wind-down period has not been shown to facilitate a single additional sale of cannabis products, nor to add a single dollar to any cannabis-related enterprise.  In other words, the UST has not shown how any Congressional policy is offended by permitting Debtor to conduct an orderly liquidation of its stock in Lowell Farms.

Third, as set forth below in connection with the Money Laundering Statutes, Debtor's proposed liquidating Plan provides the same type of remedy that criminal law itself provides.  Debtor simply proposes to pay its creditors by selling its stock, over time, in a company that is legally traded in Canada.

Finally, the two decisions of the Court of Appeals for the Tenth Circuit cited by the UST at oral argument add nothing to his position.  Those cases held that a

bankruptcy trustee was subject to the same nonbankruptcy defenses as the debtor, such as "*in pari delicto,*" notwithstanding that both "doctrinal and public policy" reasons might favor the opposite outcome. *Sender v. Buchanan (In re Hedged-Inv. Assoc's, Inc.),* 84 F.3d 1281, 1285-86 (10th Cir. 1996), *and see Sender v. Simon,* 84 F.3d 1299 (1996). The UST apparently takes these holdings to mean that this case should be dismissed, even though doctrinal and public policy reasons might weigh against his MTDs. But that argument flips the *Sender* cases on their heads.

The Tenth Circuit held that doctrine and policy cannot trump the statutory mandates of §§ 541 and 544, whereas the UST does not point to any portion of § 1112 that mandates dismissal. He is the one arguing that his perception of a doctrine and policy against cannabis should trump the Congressional mandates embodied in the rest of the Bankruptcy Code: to maximize distributions to creditors, recover avoidable transfers, and otherwise administer bankruptcy cases consistent with Congress' carefully structured bankruptcy system. *See Hacienda,* 647 B.R. 748, 754-56.

In sum, it is true that Debtor has not withdrawn from what is probably a technical ongoing conspiracy to violate the CSA. But the UST has not shown how Debtor's orderly postpetition liquidation of its stock in Lowell Farms offends the principles in the Bankruptcy Code in any way, let alone establishes sufficient "cause" to mandate dismissal under § 1112.

Congress chose not to list violations of criminal law as an example of "cause" mandating dismissal. In the circumstances of this case, this Court finds and concludes that dismissal would undermine the Congressional mandates embodied in the rest of the Bankruptcy Code.

### c. Alternatively, the "unusual circumstances" exception applies

As this Court previously stated:

> Congress has provided that even when there is "cause" to dismiss or convert a case, this Bankruptcy Court must not to do so under the "unusual circumstances" test described above. *See* § 1112(b)(2). The elements of this test have been satisfied, at least in the absence of

evidence that prosecutors intend to single out Debtor for particularly harsh treatment that would undermine any ability to pay creditors and otherwise make appropriate use of the bankruptcy system.

Specifically, the unusual circumstances in this case are as follows. First, Debtor has divested itself, prepetition, of any direct involvement in the cannabis business.  Second, unlike most dismissals by this Court, which generally involve situations such as a pending foreclosure of fully-encumbered property and no realistic possibility of a distribution to unsecured creditors, in this case any dismissal would undermine a very realistic possibility of a substantial payment to creditors.  That successful outcome appears to be very likely because the only thing for Debtor to do is to sell its stock in [Lowell Farms], which appears to be legal and feasible under Canadian law, and then to use the proceeds to pay creditors ….

These facts also establish the other elements of the "unusual circumstances" test: conversion or dismissal is not in the best interests of creditors; there is a reasonable likelihood of confirming a plan in a reasonable amount of time; even if Debtor's acts and omissions in seeking to divest itself of its assets and pay creditors … violated [criminal] law [postpetition], and would otherwise mandate dismissal, Debtor's attempt to maximize value and pay creditors establishes a "reasonable justification" for such acts and omissions; and, so long as Debtor's process of selling or distributing its stock in [Lowell Farms] does not take too long, any violation of law can be "cured within a reasonable time." [In re] *Rosenblum,* 608 B.R. [529] at 536-37 [Bankr. D. Nev. 2019] (reviewing elements of § 1112(b)(2)).

In addition, this Bankruptcy Court is mindful of the fact that there are many other tools to address any wrongful or illegal conduct by any debtor in possession of the bankruptcy estate.  For example, in appropriate circumstances a trustee or examiner can be appointed (§ 1104), or sanctions can be imposed.  *See, e.g.,* Rule 9011.  The availability of such alternatives reinforces a more flexible interpretation of § 1112 as just one of many possible tools, not a tool that this Bankruptcy Court has to use regardless of the consequences.

In addition, this Bankruptcy Court notes that there are many non-bankruptcy tools that can be used to address any illegal activity.  Remedies can be sought, in appropriate situations, by prosecutors, private attorneys general, class action representatives, individual plaintiffs, and others, such as local, state, and national governments, to address any violations of nonbankruptcy law in a more nuanced and targeted manner than the blunt tool of dismissing bankruptcy cases.  Again, the availability of such alternatives reinforces this Bankruptcy Court's interpretation of § 1112(b) as providing some discretion: dismissal is not the only remedy. [*Hacienda,* 647 B.R. 748, 756-57 (all formatting in original).]

**d. No showing that Debtor's proposed liquidating plan will achieve a result**

**that is inconsistent with the Money Laundering Statutes**

The UST argues that Debtor's proposed distribution of funds to creditors under its

proposed Plan would violate the Money Laundering Statutes (18 U.S.C. §§ 1956 and 1957).  Those statutes criminalize: (A) engaging in any financial transaction made with proceeds of unlawful activity with the intent to promote the carrying on of specified unlawful activity (18 U.S.C. § 1956(a)(1)(A)), (B) transporting funds or monetary instruments generated by certain criminal activities into, out of, or through the United States in order to promote further criminal activities (18 U.S.C. § 1956(a)(2)(A)), and (C) engaging in financial transactions with $10,000.00 or more of the proceeds of certain criminal activities (18 U.S.C. § 1957).

This Bankruptcy Court presumes for purposes of this Opinion that Debtor's ownership and proposed liquidation of Lowell Farms' shares would violate the Money Laundering Statutes *outside of* a federal court-supervised liquidation to pay creditors. *See United States v. Manarite,* 44 F.3d 1407, 1416 (9th Cir. 1995) (concluding that cashing in chips from a chip-skimming scheme constituted promotional money laundering because "[t]he chip-skimming scheme could not benefit its participants unless the chips were cashed"); *United States v. Montoya,* 945 F.2d 1068, 1076 (9th Cir. 1991) (concluding that depositing a bribe check constituted promotional money laundering because "Montoya could not have made use of the funds without depositing the check").

But Debtor is proposing a liquidation under a federal court's supervision – this Bankruptcy Court – pursuant to Congress' statute that carefully regulates any such liquidation: namely, the Bankruptcy Code.  The UST's argument for dismissal of this bankruptcy case would interpret the Bankruptcy Code (§ 1112) *implicitly* to prohibit what the Money Laundering Statutes *expressly* endorse: namely the liquidation of assets obtained from criminal activity and distribution of funds to creditors, including any victims of the unlawful activity.  Specifically, the Money Laundering Statutes contemplate, as one remedy, the appointment of a "Federal Receiver" to "collect, marshal, and take custody, control, and possession of all assets," *including* any "proceeds of [the] unlawful activity," in order to pay "restitution to any victim" of the

1  unlawful activity or, more broadly, to satisfy any "civil judgment."  18 U.S.C.

2  § 1956(a)(1), (b)(4)(A), & (c)(9).

3      The UST cites no authority holding that distributions pursuant to the Bankruptcy

4  Code can violate the Money Laundering Statutes.  To the contrary, the relevant

5  authorities reflect that federal law has no absolutely inflexible rule that any association

6  with illegality bars any recourse to the federal courts.  *See, e.g., Bart Street III v. ACC*

7  *Enterprises, LLC,* 2020 WL 1638329 at *5 (D. Nev. Apr. 1, 2020) (citing authority that

8  "promissory notes financing a marijuana business are not automatically void because

9  federal courts do not take such a black-and-white approach to enforceability" and that

10  "ordering payment on the parties' contract would not mandate illegal conduct") (citations

11  and internal quotation marks omitted).

12      Moreover, if distributions to Debtor's creditors would constitute money

13  laundering, then most debtors in bankruptcy would be violating the Money Laundering

14  Statutes because some portion of their assets often is derived in one way or another

15  from violating state and/or federal laws – *e.g.,* restaurants that violate wage and hour

16  laws, slum lords, Debtors who owe back taxes, Ponzi schemes, corporate fraud, etc.

17  The UST has not shown a sufficient basis for such an extreme interpretation of § 1112.

18      **e. No intent to condone illegal activity**

19      This Bankruptcy Court emphasizes that nothing in this Opinion should be

20  interpreted as condoning illegal activity.  Illegal activity *can* be cause for dismissal in

21  appropriate circumstances, both as a matter of interpreting Congress' directives in

22  § 1112(b) and, more generally, to preserve the integrity of the bankruptcy courts that

23  Congress has established.  *See, e.g., In re Mattiace Industries, Inc.,* 76 B.R. 44, 47-48

24  (Bankr. E.D.N.Y. 1987) (dismissing chapter 11 bankruptcy case because debtor's

25  continued violations of state environmental regulations endangered public health and

26  conversion was inappropriate due to difficulties a trustee would face in managing

27  debtor's hazardous waste site with limited estate resources).

28      In addition, nothing in this Opinion is intended to preclude federal prosecutors in

-18-

future from pursuing any remedies against the Canadian company for any sales of cannabis in the United States that are illegal under federal law.  Moreover, in the unlikely event that Debtor's liquidation of its stock in the Canadian company were to generate surplus proceeds for distribution to Debtor's equity owners, prosecutors remain free to seek recovery of those profits based on the Money Laundering Statutes, or any other remedies that do not contravene this Court's order confirming the Plan or violate the releases set forth in Debtor's liquidating plan – *e.g.,* persons distributing funds could not be penalized for implementing the Plan as authorized by this Court, but prosecutors could take steps to seize any distributions of profits on the basis of the Money Laundering Statutes or any other applicable criminal law, if they chose to pursue such remedies.

This Bankruptcy Court believes that it would be overstepping its role, and acting contrary to Congress' directives within the Bankruptcy Code, if it were to deny creditors, debtors, employees, equity investors, and other constituencies the benefits and protections of bankruptcy based on the facts and circumstances presented.  In general this Bankruptcy Court should defer to prosecutors, and all of the other types of persons mentioned above, to use their discretion about whether and how to address any violations of nonbankruptcy law.  *See Cook Investments*, 922 F.3d 1031, 1036 (rejecting "ombudsman" role of bankruptcy court).  Such parties can pursue remedies in a more nuanced and targeted manner, rather than using the blunt tool of dismissal, which on the record presented is contrary to the best interests of creditors and the estate.

These considerations apply with special force given that there is no evidence that any prosecutor is even pursuing any relief against Debtor.  In other words there is no way that, by administering this bankruptcy case, this Bankruptcy Court is interfering in any criminal prosecution.  *Cf. United States v. McIntosh,* 833 F.3d 1163 (9th Cir. 2016) (Congressional appropriations rider prohibits federal prosecutors from spending funds to prevent States' implementation of their own medical marijuana laws).

**f. Conclusion as to the Second MTD**

There is no doubt that a debtor's connections with cannabis can, in some circumstances, result in dismissal of their bankruptcy case.  But in this case Debtor is attempting to divest itself of its investment in a Canadian cannabis business that is legally traded on a Canadian stock exchange; nothing that Debtor proposes to do postpetition will foster a single additional sale of cannabis products, nor will it add a single dollar to any cannabis-related enterprise; and Debtor's proposed Plan provides for an orderly liquidation for the benefit of creditors, much as a receiver under the Money Laundering Statutes would do.  In these circumstances, and in the exercise of this Bankruptcy Court's discretion, the Second MTD will be denied.  *See generally Burton,* 610 B.R. 633, 638-39 (some debtors "attempt to reorganize and continue their marijuana-related business, while other debtors wish to use the bankruptcy process to sever their connection to the business" and "the flexible cause standard [for dismissal of bankruptcy cases] coupled with the abuse of discretion standard of review on appeal" give bankruptcy courts "appropriate latitude" to "deal with these variations") (citing cases).

**6. Whether to certify any order on the Second MTD for direct appeal**

Both parties raise the possibility that, if this Bankruptcy Court were to rule against them, a direct appeal to the Court of Appeals for the Ninth Circuit might be appropriate under 28 U.S.C. § 158(d)(2)(A).  But, at least on the present record, this Bankruptcy Court is not inclined to certify the matter for direct appeal.

First, this matter does not involve a pure "question of law" as to which there is no controlling decision in the Ninth Circuit or a matter of public importance.  28 U.S.C. § 158(d)(2)(A)(i).  This matter involves a mixed question of law and fact – *i.e.,* the degree of connection to or distance from transactions involving controlled substances that might warrant dismissal of this bankruptcy case, or other remedies, based on the particular facts of this case.  Deciding whether to dismiss cases that involve cannabis has been held to be a matter of broad discretion, not a pure question of law.  In addition,

given the scarcity of decisions in this area, and ongoing development of the law, the Court of Appeals for the Ninth Circuit might appreciate letting the regular appeals process play out and having additional analysis from a District Judge or the Bankruptcy Appellate Panel for the Ninth Circuit.  (Of course, the foregoing is only this Bankruptcy Court's *sua sponte* determination under § 105(a), and nothing prevents the parties from filing papers to persuade this Court to change its mind, or from pursuing any other appropriate relief such as jointly certifying a direct appeal if they believe there are sufficient grounds to do so.  *See* 28 U.S.C. § 158(d).)

Second, for the same reasons, this matter does not involve a pure "question of law" requiring resolution of conflicting decisions.  28 U.S.C. § 158(d)(2)(A)(ii).  True, various reported decisions have reached different outcomes.  But the facts of the cases have varied considerably, so it is not clear that there is actually any conflict among the reported decisions, or at least any clearly developed conflict when the legal arguments and analysis in this area are still evolving.

Finally, for the same reasons, although it is possible that an immediate appeal might speed up this case by reaching a faster final decision, that is not a foregone conclusion because the Court of Appeals for the Ninth Circuit might decline any direct appeal.  More generally, the normal process of appeals might better "advance the progress" of this case by providing more perspectives on this evolving area of the law before the Court of Appeals is faced with deciding the application of the law to the particular facts of this case.  28 U.S.C. § 158(d)(2)(iii).

For all of these reasons, this Bankruptcy Court is not certifying any direct appeal at this time.

**7. Conclusion**

As directed at the Status Conference on September 19, 2023, Debtor should lodge a proposed order denying the Second MTD for the reasons stated in this Opinion, and that order should include a temporary stay.  At the upcoming continued Status Conference this Court will address any appropriate procedural issues, including whether

to extend that stay so that the parties can have additional time to file a motion for a stay

pending appeal, or file a motion or certification for a direct appeal to the Court of

Appeals.

### 

Date: September 20, 2023

Neil W. Bason
United States Bankruptcy Judge